IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No.22-cr-00209-DDD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    ALLEN TODD MAY,
    a/k/a ALAN MAY,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Martha A. Paluch, Assistant United States Attorney for the District of Colorado, and the defendant, ALLEN TODD MAY, personally and by counsel, Dru R. Nielsen, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado, the Criminal Division of the United States Attorney's Office for the Northern District of Texas, the Criminal Division of the United States Attorney's Office for the Southern District of Florida, and the defendant.

## I.    AGREEMENT

### A. Defendant's Plea of Guilty:

The defendant agrees to

COURT EXHIBIT
1
22-cr-00209

(1)     plead guilty to Counts 1 and 18 of the Indictment, charging violations
        of 18 U.S.C. § 1343, Wire Fraud, and 18 U.S.C. § 751(a), Escape
        respectively;

(2)     waive Indictment and plead guilty to Count 1 of an Information,
        charging a violation of 18 U.S.C. § 1343, Wire Fraud, and Count 2,
        charging a violation of 18 U.S.C. § 1028A, Aggravated Identity Theft;

(3)     waive venue to all of the conduct alleged as relevant conduct in this
        plea agreement that did not occur within the District of Colorado;

(4)     waive certain appellate and collateral attack rights, as explained in
        detail below;

(5)     ask for a total sentence of not less than 50 percent off the bottom of the
        guideline range as calculated by the Court on his convictions of Counts
        1 and 18 of the Indictment and Count 1 of the Information, which
        combined sentence will then be followed by a two-year mandatory
        prison sentence on his conviction of Count 2 of the Information for
        Aggravated Identity Theft, and which sentences will run consecutive to
        any time remaining on the sentence imposed in the United States
        District Court for the Northern District of Texas in Case No. 3:10-cr-
        00175-B;

(6)     be liable for restitution to multiple victims in amounts to be
        determined prior to sentencing;

(7)     agree not to contest forfeiture as more fully described below.

**B. Government's Obligations:**

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A) and (B). The

government agrees not to bring other charges against the defendant, other than the

two counts set forth in the Information to which the defendant has agreed to plead

guilty, based on information currently known to the United States Attorney's Office,

District of Colorado and to move to dismiss Counts 2 through 17 of the Indictment

with prejudice upon the defendant's guilty plea to Counts 1 and 18 of that

Indictment.  The United States Attorney's Offices for the Northern District of Texas

and Southern District of Florida have also agreed not to bring charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado as conveyed to those districts and as contained in this plea agreement. Should the plea of guilty be vacated on the motion of the defendant, any or all of the named Districts may, in their sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and/or potentially file a superseding indictment or indictment in any of these districts.

The government also agrees to recommend a sentence within the Guidelines range as calculated by the Court at sentencing.

Provided the defendant does not engage in prohibited conduct (*i.e.*, additional fraud) or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 at any time prior to sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

### C. Defendant's Waiver of Appeal:

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

    (1)    the sentence exceeds the maximum sentence provided in the statutes of conviction, 18 U.S.C. §§ 1343, 751(a) and 1028A;

    (2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of 26; or

    (3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

    (1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

    (2)    the defendant was deprived of the effective assistance of counsel; or

    (3)    the defendant was prejudiced by prosecutorial misconduct.

The Defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed

upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**Forfeiture of Assets**:

The defendant admits the forfeiture allegations set forth in the Indictment and Information. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 18 U.S.C. § 2461(c), and 982(a)(2)(B) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to: 14716 Perthshire Road, Unit E, Houston, Texas, 77079; 2002 27ft Sea Ray Sundeck boat with Hull number SERR2085I102 and any related insurance proceeds;[1] and a money judgment in the amount of the proceeds obtained by the defendant's scheme. The defendant agrees and consents to

---

[1] To the extent the government identifies additional specific assets prior to sentencing, it will list those assets in the Motion for a Preliminary Order for Forfeiture.

the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.   The defendant agrees that he caused these items to be purchased with proceeds from the crimes to which he is pleading guilty.  The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters.  Having been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his/her rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him/her if notice is not sent within the prescribed time frames.  The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offenses, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met.  The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final

decision of whether to grant relief rests solely with the Department of Justice,

which will make its decision in accordance with applicable law.

## II.    ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of the crimes to which the defendant is

pleading guilty are as follows:

### Count 1 (Indictment) and Count 1 (Information): 18 U.S.C. § 1343: Wire Fraud

    a. The defendant devised or intended to devise a scheme to defraud or to obtain money and property from others  by means of materially false and fraudulent pretenses, representations, and promises, as alleged in the Indictment;

    b. The defendant acted with the specific intent to defraud;

    c. The defendant caused another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

    d. The scheme employed false or fraudulent pretenses, representations, or promises that were material.

10th Circuit Criminal Pattern Jury Instructions 2021 Edition § 2.57.

### Count 18 (Indictment): 18 U.S.C. § 751(a): Escape

    a. The defendant was in federal custody pursuant to a lawful arrest on a felony charge at an institution or facility where the defendant was confined by direction of the Attorney General for conviction of an offense;

    b. The defendant departed without permission; and

    c. The defendant knew he did not have permission to leave federal custody.

10th Circuit Criminal Pattern Jury Instructions 2021 Edition § 2.35.

**Count 2 (Information): 18 U.S.C. § 1028A: Aggravated Identity Theft**

a. The defendant knowingly transferred, possessed, or used without lawful authority, a means of identification of another person;

b. The defendant knew that the means of identification belonged to another actual person;

c. The defendant's conduct was during and relation to a felony violation, namely, wire fraud; and

d. The defendant's transference, possession, or use of the means of identification was done in a manner that was fraudulent or deceptive and at the crux of the felony violation.[2]

Definitions:

The term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any – access device.

An "access device" includes any card, plate, code, account number, electronic serial number, mobile identification number or personal identification number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds.

## III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 1 of the Indictment and Count 1 of the Information, Wire Fraud, in violation of 18 U.S.C. § 1343, is not more than 20 years in prison; a fine of not more than $250,000 or not more than the

---

[2] No 10th Circuit Criminal Pattern Jury Instruction. *See* 18 U.S.C. § 1028A(a)(1); *Flores –Figueroa v. U.S.*, 556 U.S. 646 (2009) (Statute requires proof that the defendant used the means of identification in question knowing that it belonged to another, actual person). *Dubin v. U.S.*, 143 S.Ct. 1557 (June 8, 2023) (Statute requires that a defendant's misuse of another person's means of identification must be at the crux of what makes the underlying offense criminal, rather than ancillary to the offense).

greater of twice the gross pecuniary gain or twice the gross pecuniary loss resulting from the offense, or both fine and imprisonment; $100 special assessment; a term of supervised release of not more than three years; restitution and forfeiture to be determined at the time of sentencing.

The maximum sentence for a violation of Count 18 of the Indictment, Escape, in violation of 18 U.S.C. § 751(a), is not more than 5 years in prison; a fine of not more than $250,000, or both fine and imprisonment; $100 special assessment; and a term of supervised release of not more than one year.

The maximum sentence for a violation of Count 2 of the Information, Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A is not more than two years in prison to be served consecutively to any sentence imposed on the underlying crime; a fine of not more than $250,000; $100 special assessment; a term of supervised release of not more than one year; restitution to be determined at the time of sentencing.

## IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

## V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are

pertinent to those considerations and computations. To the extent the parties

disagree about the facts set forth below, the stipulation of facts identifies which

facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-

contradictory additional facts which are relevant to the Court's guideline

computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing

decision.

The parties stipulate that the following facts are true and correct:

When an oil company is unable to locate a person or company to whom oil

and gas royalties are owed, those royalties accrue in a suspense account. After a

certain number of years, which varies depending on the state, the oil company turns

over to the state the unclaimed funds, any records about those unclaimed funds,

and the responsibility of administering those funds. Many states have databases

that make the search for unclaimed royalties accessible to the public and easy to

use.

**Facts supporting Count 1 of the Indictment (Wire Fraud):**

From at least mid-2016 through December 21, 2018, while incarcerated, the

defendant devised a scheme to defraud whereby he falsely and fraudulently claimed

that he and entities controlled by him were entitled to oil and gas royalties that had

not yet been claimed by the true owners. As for the fraud he committed while

housed at the Federal Prison Camp in Englewood, CO in 2018, the defendant

conducted this fraud through his unlawfully obtained iPhone, which he was able to

purchase through a fellow inmate soon after he arrived at the Federal Prison Camp.

The defendant accessed various online sites on his phone to identify a number of business entities that were owed unclaimed oil and gas royalties. He caused to be filed with Secretaries of State corporate documents for the formation of business entities, under his control, in the names of businesses that were owed unclaimed oil and gas royalties. Because he was incarcerated, he provided the home address of his friend L.M. as the business address for these newly created business entities.

The defendant also caused to be filed with Secretaries of State "assumed name" corporate documents relating to those entities as well as certificates of merger between those entities and other entities to make it appear as though the entities that were owed royalties were the same as, or merged with, other entities that he controlled. The defendant filed, and caused to be filed, claims for unclaimed oil and gas royalties that falsely and fraudulently represented that he was making those claims on behalf of the business entities that were legally entitled to the royalties and that there were no other owners entitled to those royalties.

During this time, the defendant directed L.M. to open bank accounts in the names of the business entities that were owed unclaimed royalties and with the names of such entities listed as "dbas" for other entities and accounts controlled by the defendant. In response to the defendant's fraudulent claims for royalties, royalty checks were sent to L.M.'s home address, and the defendant gave L.M.

directions about how, when, and where to deposit those checks so that the defendant would be able to spend the fraudulently obtained funds, some while incarcerated, and most upon his escape.

For the scheme the defendant ran while in prison, he obtained more than $700,000 in royalties to which he was not entitled. A list of the entities defrauded by the defendant while in prison and the amounts he obtained from each is attached hereto as Attachment A, is incorporated into this plea agreement by reference, and is agreed to by the defendant. The defendant also admits that he caused 14716 Perthshire Road, Unit E, Houston, Texas, 77079, to be purchased with proceeds he obtained through this scheme run by him while in prison.

In furtherance of the scheme, defendant sent, and caused to be sent, interstate wires in the form of emails, telephone calls, and inputting information into websites. As charged in Count 1 of the Indictment, on or about May 23, 2018, for purposes of executing his scheme, the defendant transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds as follows: from Colorado, the defendant accessed the website for the Kansas Treasurer Unclaimed Property, which was then located outside of Colorado, to initiate claims for unclaimed royalties owed to Energy E. & P. Inc.[3]

---

[3] For privacy reasons, the full names of the victim companies have not been used but are known to both the defendant and the United States.

**Facts supporting Count 18 of the Indictment (Escape):**

In 2018, the defendant was in federal custody pursuant to a lawful arrest on a felony charge at an institution or facility where the defendant was confined by direction of the Attorney General for conviction of an offense. Specifically, the defendant had been transferred to the Federal Prison Camp in Englewood, Colorado, to continue serving his 20-year sentence imposed in the United States District Court for the Northern District of Texas in Case No. 3:10-cr-00175-B.

At the camp, the defendant worked as the clerk for facilities. As such, he signed out keys to maintenance vehicles. The defendant drove vehicles on the prison grounds as part of his job responsibilities. Accordingly, it was necessary for the defendant to possess a valid Colorado driver's license, which he did.

On December 21, 2018, the defendant signed out the keys to his supervisor's truck and drove it off the Federal Prison Camp compound. The defendant departed the facility without permission and knew he did not have permission to leave federal custody. Using a credit card mailed to him by L.M., the defendant purchased clothing and supplies at a nearby store. He used his driver's license and credit card to rent a U-Haul which he drove to Fort Worth, Texas, where he left it and purchased a used vehicle. The parties agree that nobody attempted to stop the defendant and he used no force or threats in leaving the camp. The defendant simply drove off the camp grounds, commonly referred to as a walk away.

**Facts supporting Count 1 of the Information (Wire Fraud):**

While in Fort Worth, the defendant started the oil and gas royalty scheme again. This time, since he was no longer incarcerated, it was easier for the defendant to create and submit the false documentation needed to claim the royalties. Since he was on the run, however, he needed a new identity to carry out the scheme.

The defendant searched for inmate names on an online database, selected inmates who were serving lengthy prison sentences, called prison education departments posing as a parole office employee to verify that inmate's social security number and date of birth, and then purchased fake identification cards online in those inmates' names and with their personal identifying information. Between the time of his escape and capture, the defendant used the following names, and others, to conduct the scheme and/or presented himself to others as: B.P., T.H., J.T., J.F., and M.S., whose identities are known to the government and to the defendant.

The defendant also set up virtual offices in Colorado and Florida to list as addresses on the various documents needed for the scheme and to receive correspondence and checks from oil and gas companies.

The defendant carried out the scheme while on absconder status in essentially the same manner as he did while incarcerated.

In order to receive the funds, the defendant directed others (typically romantic partners or friends) to open bank accounts in the names of the business entities that

were allegedly owed unclaimed royalties and with the names of such entities listed as "dbas" for other entities and accounts controlled by the defendant.

In response to the defendant's fraudulent claims for royalties, royalty checks were either direct deposited into bank accounts controlled by the defendant or sent to the virtual offices the defendant set up in Colorado and Florida. The defendant directed those virtual offices to forward his mail to him wherever he was living at the time. Checks were deposited into accounts he controlled via automated clearing house (ACH) deposits or the defendant and others at his direction deposited those checks so that the defendant would be able to spend the fraudulently obtained funds.

While it appears the defendant attempted to claim oil and gas royalties that had not yet been claimed by the true owners, this was not always the case. For example, in February of 2022, the defendant claimed to be M.L. and claimed "she," M.L., wanted to sell her interest in certain leases, held at that time by Company 1, to another company, Fifty First Street Associates. Fifty First Street Associates was a fraudulent company created by the defendant. Company 1 was an oil and gas exploration and production company located in Denver, CO. The defendant, posing as M.L., executed the necessary documents to effectuate this sale and between May of 2022 and August of 2022, the defendant, as Fifty First Street Associates, received four payments from Company 1 totaling $1,127,343.71.

In July of 2022, Company 1 received notice that in fact M.L. had died on March 15, 2008, and that "Fifty First Street Associates out of Miami . . . is a shell company that all goes back to this guy who is in prison for basically doing the same thing 10

years ago." M.L.'s legitimate heirs requested that all interest Company 1 held in the name of M.L. be directed to them. Once Company 1 conducted its own research payments to the defendant on leases owned by M.L. were stopped in August of 2022.

The defrauding of Company 1 related to money rightfully owed to M.L.'s heirs forms the basis for Count 1 of the Information. Specifically, to further his scheme, the defendant sent, and caused to be sent, interstate wires in the form of emails, telephone calls, and inputting information into websites. As charged in Count 1 of the Information, the defendant transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds as follows: on May 24, 2022, as a result of the defendant's false claims, Company 1, an oil and gas exploration and production company located in Denver, CO, wired $1,028,328.63 to Bank 1 Savings account #XXXX3553 located outside of Colorado, which account was controlled by the defendant for the receipt of unclaimed royalties owed to M.L. (with a small portion of this amount owed to a separate fraud victim), whose identities are known by the government and the defendant.

The additional fraud the defendant committed while on absconder status (unlawfully asserting that he was entitled to unclaimed oil and mineral rights) is the same type of fraud he committed while in prison which led to the instant Indictment. As such, the defendant agrees and stipulates that those losses – the majority of which occurred in other districts – are properly considered relevant conduct for purposes of U.S.S.G. § 1B1.3(a)(2) in that they were "part of the same

course of conduct or common scheme or plan as the offense of conviction," and therefore, the loss calculation in this case for guidelines purposes should be based on the total amount of loss (fraud committed while in prison and while on absconder status). Any additional charges for this conduct would group pursuant to § 3D1.2(d) as the conduct was "ongoing and continuous in nature."

From at least January 2019 through his capture in August of 2023, the defendant directly obtained more than $8.3 million as a result of his Scheme. After his arrest in August of 2023, certain entities continued to make ACH deposits into accounts to which the defendant's associates had access and mobile deposits were made into these accounts as well. Approximately $23,000 was deposited between the time of the defendant's arrest and April of 2024, when the government was able to stop these deposits. By the time the government learned of this approximately $23,000 amount, it had already been spent by the defendant's associates. Because the defendant's fraudulent conduct caused these additional deposits, the defendant agrees that this amount is properly included in the loss and restitution calculations, bringing the total amount of loss/restitution from the fraud scheme while he was on absconder status to approximately $8.4 million.

Attached to this plea agreement as Attachment B, and incorporated by reference herein, is a chart setting forth the entities defrauded by the defendant while on absconder status and the amounts these entities sent to accounts controlled by the defendant. The defendant agrees with these calculations.

Attached to this plea agreement as Attachment C, and incorporated by reference herein, is a chart setting forth the total amount of fraud proceeds the defendant caused while in prison, the total amount of fraud proceeds he caused while on absconder status, and the total amount of fraud proceeds that were deposited into accounts he controlled after his arrest and up through April of 2024. The defendant agrees that these proceeds constitute the total amount of loss and restitution in this case, $9,130,035.27.[4]

The defendant also agrees that he caused the 2002 27ft Sea Ray Sundeck boat with Hull number SERR2085I102 to be purchased with proceeds he obtained from the scheme while on absconder status.

**Facts supporting Count 2 of the Information (Aggravated Identity Theft):**

As noted above, to avoid apprehension, it was necessary for the defendant to assume the identity of others while on absconder status. One of the identities he assumed was that of J.T. J.T. is an inmate in the State of Texas. The defendant assumed J.T.'s identity in at least October of 2022. The defendant ran his Scheme using J.T.'s identity and presented himself to others as J.T. During the course of the scheme, the defendant also assumed the identity of other inmates and conducted this scheme in their names as well.

---

[4] Because it is difficult to determine the rightful owners of these oil and gas royalties, the government submits that the restitution in this case should be paid to the oil and gas companies that paid out the royalties as a result of the defendant's fraud. Those companies in turn will be responsible for distributing the funds to the rightful owners and/or escheating the funds to the state.

As alleged in Count 2, the defendant did knowingly transfer, possess or use, without lawful authority, a means of identification of another person, to wit, the name, date of birth, and social security number of J.T., during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, wire fraud in violation of Title 18, United States Code, Section 1343, which is a violation of Title 18, United States Code, Section 1028A.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

**Count 1, Wire Fraud (Indictment) and Count 1 (Information)[5]**

 a) Under Section 2B1.1, the base offense level is 7.

 b) An 18-level enhancement applies because the loss alleged in the Indictment, $700,000, plus the fraud that occurred while on absconder status as alleged in the Information and relevant conduct, $8.4 million, is more than $3.5 million but less than $9.5 million. § 2B1.1(b)(1)(J).

 c) A 2-level enhancement applies because there were more than 10 victims. § 2B1.1(b)(2)(A)(i).

 d) A 2-level enhancement applies because the defendant relocated a fraudulent scheme to another jurisdiction to evade law enforcement, § 2B1.1(b)(10)(A), and the offense involved sophisticated means through the use of fictitious entities, § 2B1.1(b)(10)(C).

 e) The adjusted offense level is 29.[6]

 f) The parties agree the defendant is entitled to a 3-level reduction for acceptance of responsibility. § 3E1.1(a) and (b). The resulting total offense level is therefore 26.

**Count 18 (Indictment), Escape**

 g) Under Section 2P1.1, the base offense level is 13 because the defendant was serving a sentence on a conviction when he escaped.

 h) There are no specific offense characteristics.

 i) This group will be discarded because it is more than 9 levels less serious than the wire fraud. § 3D1.4(c).[7]

---

[5] These counts group pursuant to § 3D1.2(d) as the scheme conduct was "ongoing and continuous in nature."

[6] Because the defendant is pleading guilty to Aggravated Identity Theft in violation of 18 U.S.C. § 1028A, the enhancements set forth in § 2B1.1(b)(11) do not apply. *See* § 2B1.6 App. N. 2.

[7] While this group "will not increase the applicable offense level," it "may provide a reason for sentencing at the higher end of the sentencing range for the applicable

**Count 2 (Information) Aggravated Identity Theft**

As it relates to the aggravated identity count, § 2B1.6(a) states in pertinent part: "If the defendant was convicted of violating 18 U.S.C. § 1028A, the guideline sentence is the term of imprisonment required by statute." Section 1028A provides a mandatory term of imprisonment of 2 years imprisonment in addition to any sentence imposed on the underlying felony.

There are no victim-related, obstruction, role in the offense or multiple count adjustments as Chapter Three adjustments of the guidelines do not apply for this offense. *See* USSG § 2B1.6, Notes 2 and 3.

j)    The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions. Based on consultation with the United States Probation Office, the parties believe the defendant is in criminal history category V. The defendant will receive 3 points for a 1991 conviction for theft in the amount of more than $750 and less than $20,000. He will also receive 3 points for a 2002 theft conviction for the defendant failing to pay a $3,627.61 bill. The defendant believes that these points are improperly assessed to him, given the age of these convictions and the underlying conduct, and he therefore intends to file a motion arguing that his criminal history is overrepresented. If the defendant prevails on this motion, his criminal history category would be II. The advisory guideline calculations below pertain to those that apply to CHC V.

k)    The career offender/criminal livelihood/armed career criminal adjustments do not apply.

l)    The advisory guideline range resulting from an adjusted base offense level of 26 and a criminal history category of V is 110-137 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time,

offense level." § 3D1.4(c).

the offense level(s) estimated above could conceivably result in a range from 63 months (bottom of Category I) to 150 months (top of Category VI). The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction. In addition, any sentence imposed on Counts 1 and 18 of the Indictment and Count 1 of the Information will be followed by a mandatory two-year sentence on Count 2 of the Information.

m)  Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $25,000 to $250,000, plus applicable interest and penalties.

n)  Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is not more than three years.

o)  The defendant agrees to pay restitution and forfeiture in amounts to be determined prior to sentencing.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement,

neither the government nor the defendant has relied, or is relying, on any other

terms, promises, conditions or assurances.


Date: 10/22/2024

_____
ALLEN TODD MAY
Defendant


Date: 10/22/24

_____
DRU R. NIELSEN
Attorney for Defendant


Date: 10/22/24

_____
MARTHA A. PALUCH
Assistant U.S. Attorney